## LAWSON v. BARBER & CO., Inc.

(Circuit Court, E. D. New York. July 22, 1911.)

1. EQUITY (§ 43*)—JURISDICTION—RETENTION OF JURISDICTION ACQUIRED.

Though complainant in a suit in equity to rescind a contract with defendant, who was nominally an agent, but really the principal, and for an accounting, had an adequate remedy at law for breach of warranty, where the court on the first argument refused to dismiss in equity and remit the party to an action at law, the action having been tried in 1904, and finally submitted in 1906, and resubmitted on final argument in 1907, and the parties having taken over four years to submit their briefs, the equity court will decide the cause on its merits.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 121–140; Dec. Dig. § 43.*]

2. SALES (§ 441*)—REMEDIES OF BUYER—SUIT FOR BREACH OF WARRANTY—SUFFICIENCY OF EVIDENCE.

In a suit in equity, evidence *held* insufficient to show a breach of warranty of the quality of coal sold by the respondent to complainant, or any legal basis for estimating damage from such a breach.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1277–1283; Dec. Dig. § 441.*]

3. SALES (§ 442*)—ELEMENTS—DAMAGES.

Where complainant purchased coal from respondent as agent of a seller in Wales, but the respondents were in fact the principals, and on a dispute arising as to the quality of the coal the complainant sent a representative to Wales to see the supposed principal, the complainant is entitled to recover the provable disbursements in sending the representative to Wales.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1284–1301; Dec. Dig. § 442.*]

In Equity. Suit by William C. Lawson against Barber & Co., Incorporated. Decree for complainant, for reference to determine one item of damages, and for respondent, dismissing the balance of the bill.

Peale & Blair, for complainant.

Butler, Notman & Mynderse (Archibald G. Thacher, of counsel), for respondent.

CHATFIELD, District Judge. The complainant has brought a suit in equity asking for relief in the form of rescission of contract between the complainant, as assignee of two parties, the Hazard Wharf Company and one Lloyd, an attorney at law, and the respondent, nominally an agent, but whom the complainant now alleges to be principal. The complainant also demands an accounting, in order that he may be allowed the amount by which his expenses in disposing of the subject-matter of the contract in question, namely, two

steamship loads of coal, may be fixed, and that he may be decreed to be entitled to receive the amount by which his expenses, including the sum paid for the coal, exceeded what he received therefor.

In order to dispose of the issues raised, an exact determination of the positions of the parties is necessary, and will serve the purpose both of establishing premises for fixing their legal responsibility and also finding the facts upon the testimony as presented.

Barber & Co. are steamship agents, and during the pendency of the coal strike in 1902 undertook to deliver by steamship to the Hazard Wharf Company certain coal from Wales. This was after negotiations in September of that year, through an agent of Barber & Co., with a representative of the Wharf Company from Baltimore.

A contract was entered into, and one steamship load of coal was delivered. The contract shows that it was not sold according to sample, but that the government regulations and classifications as to it were had in mind, and that the price was fixed for certain grades of coal according to size.

The feature of this contract which the respondent alleges was a material misrepresentation was that Barber & Co. undertook as steamship agents to contract for one Jones as principal, and the first cargo of coal was delivered by them nominally as agents. This cargo was accepted and paid for, and meanwhile the Hazard Wharf Company ordered another cargo. Lloyd, who, as has been said, was a lawyer, also undertook to order a cargo, in which he transferred his rights to the Wharf Company. Neither of these cargoes arrived until after the output of coal in the United States, at the termination of the strike, had caused a reduction of prices and made the cargo of coal from Wales undesirable and unprofitable in competition with the coal that could be then procured in the United States.

According to the terms of the contract, the coal had to be paid for upon certificates of loading, and both of the cargoes in question were paid for before arrival, by the complainant's assignors. When the cargoes arrived a question arose, as is contended by the respondent because of the change in the market, and as is contended by the complainant because of the condition of the coal, under which the complainant's assignors made objection to the respondent, soon after they accepted and unloaded the cargoes. At this time the situation was considered, and the purchaser, feeling that it was under contract to take these cargoes of coal and having already advanced payment therefor, went ahead with the unloading, but sent a representative to New York, who interviewed Barber & Co.'s agent, and even then did not learn that Barber & Co. were the principals in making the contract, and not the agents for Jones in Wales, as the terms of the contract stated.

If Barber & Co.'s representative could have gained any advantage by concealing the fact that they were principals, it would be strong evidence of fraud; but all of the reasons for the acceptance of the cargoes existed substantially as strongly in dealing with Barber & Co. as with Jones in Wales, and it would seem that Barber & Co.'s rep-

resentative allowed the complainant's agent to continue under the impression that Jones was the principal in the contract, and even to go to Wales to see Jones, purely to save trouble for the respondent, or to cover up his own transactions so far as Barber & Co. were concerned. And if this action were brought for a recovery of the additional expenses incurred by the concealment of the fact that Barber & Co. were the real principals, there would be little reason to decide that Barber & Co. did not cause the additional expense and damage without right so to do.

[1] But that is not the entire question we have to deal with here. This action was tried in 1904, finally submitted in 1906, and, owing to a change in the office of judge of this court, heard again on final argument in 1907. The parties have taken over four years to submit their briefs, and the court is now asked to decide that the complainant should not have come into equity, but should have brought an action at law upon a breach of the warranty that Barber & Co. were contracting agents and that Jones was the responsible principal in the transaction.

As has been said, if the complainant were suing merely for the additional damage, such a cause of action might have been proper. As it is, the court upon the first argument having refused to dismiss in equity and remit the parties to an action at law, it would seem that the case should now be disposed of upon the merits and an accounting ordered, if upon the facts there seems to be any liability within the limits of the cause of action alleged, as the testimony (already put in in great detail) shows loss of profits and actual expense resulting from the transaction, if the respondent should account therefor.

It will be remembered that the goods were not sold according to sample. They were sold at a certain price per ton, the quantity to be at the seller's option, and the only warranty as to quality was implied warranty that the coal should be of the sort represented. The complainant did not refuse to take the coal and demand his money back. He alleges as a reason therefor that he thought he was bound by contract to receive this coal with a man in Wales, and had contracted with many individuals to deliver the coal to them. He had already advanced payment for the coal, and the demurrage and other expenses incident upon any dispute or delay would be so great that he determined to complete the contract and then sue the parties whom he considered were responsible. He therefore completed the contract by accepting the coal and using it. The testimony shows that advertising had been carried on, and large quantities of the coal had been paid for, and were still desired by customers. The testimony does not show whether some of these indicated orders never materialized, nor does the testimony show whether the complainant ultimately sold the coal at a smaller price to the same parties who had been wishing it; but the record does show that the purchaser went ahead, screened and rescreened the coal, so as to remove the finer particles and dust,

and also to get out, as they say, foreign material which had been allowed improperly to be shipped with the coal, and sold the coal as best it could.

[2] If the complainant had rescinded the contract and refused to accept the coal, and had then held it subject to the seller's orders, ultimately disposing of it at the seller's risk and for his account, the result would be the same as the relief the complainant now asks, namely, that the seller pay him for the actual expense of the coal and its sale, including the price paid, and he would have accounted to the seller for the amount received for the coal. He would then have had an action in which he could claim damages for misrepresentation or breach of warranty against the proper party. He could also, as the matter now turns out, have kept the cargoes and sued Barber & Co. on this breach of contract or breach of warranty, because it is now admitted that Barber & Co. were the real principals to this contract, and that any representations or guaranties contained in the contract were actually made by them, and not by the dealer in Wales. But the complainant did not bring such an action at law, he did not sue Barber & Co., who were responsible parties, for damages, nor did he preserve any evidence, in the form of samples of the coal, so as to justify his claim that the coal was not worth the market price for which a first-class grade of the same article could have been sold, even after the termination of the coal strike. The complainant did communicate with Barber before the coal had entirely been unloaded and disposed of, and did indicate an intention to hold the seller, whom he supposed to be in Wales, accountable for what he claimed to be the poor condition of the coal. But it is impossible to see how his position was changed by the fact that Barber & Co. in reality sold him the coal, and could have been sued or held responsible for a breach of contract, and that he did not learn of this before making the trip to Wales.

It would seem, therefore, that the motion to dismiss, on the ground that the complainant had an adequate remedy at law, might have been granted, and that this action should be for damages, if any cause of action were made out. But, as has been said, the size of the record, the thoroughness of the proof, and the time which has elapsed makes it necessary to dispose of the case upon the merits, and the court will place its decision upon the testimony, which seems to show plainly that the disappointment in the result as to the later cargoes of coal, when compared with the profits from the first cargo, were caused by the conditions resulting from the settlement of the strike, and from the fact that, even when the boat landed, coal of the size in question could not be disposed of at a profit. But their position was not changed through anything that occurred with Barber & Co., nor (whether Barber & Co. acted as principals or agents) did lack of knowledge of the fact relieve the complainant from deciding as to accepting the coal when delivered. If any breach of warranty as to the quality of the coal, or any additional expense in the way of damage from Barber & Co.'s failure to disclose their own position result-

ed, it should have been made the basis of a legal action, rather than of a suit to put the parties back in the position in which they were before the contract was made. But as a matter of fact no breach of warranty as to quality is shown. It must be held that upon the evidence no proof of such damage, and no legal basis for estimating any such damage, other than the expense of the trip to Wales, has been shown.

[3] Inasmuch, however, as it is now impossible to attempt to collect those damages at law, and as the scope of this accounting proceeding is broad enough to cover any matter of accounting relating to this cause of action, the complainant may have a decree allowing the provable disbursements in sending a representative to Wales to find out what should have been told him by Barber & Co.'s representative at New York. A reference therefore may be had, if necessary, as to this cause of action.

The respondent should have a decree dismissing the balance of the bill. No costs will be allowed to either party, except for the reference to be held, which the complainant may tax.